## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

**NANCY WILLMON WOLFF**,

   Plaintiff,

v.           No. Civ. 04-1395 MCA/WDS

**UNUM PROVIDENT**, a/k/a
**UNUM LIFE INSURANCE COMPANY
OF AMERICA**,

   Defendant.

### MEMORANDUM OPINION AND ORDER

On August 5, 2005, Plaintiff Nancy Willmon Wolff ("Plaintiff") filed Plaintiff's Opening Brief to Overturn Administrator's Decision (Doc. No. 28). Defendant UNUM Provident ("UNUM") filed its amended response (Doc. No. 33) on September 26, 2005, and Plaintiff filed her reply brief (Doc. No. 35) on October 3, 2005. The Court, having reviewed the administrative record, the briefs, and the relevant law, finds that Plaintiff's motion to overturn UNUM's administrative decision denying benefits should be granted; Plaintiff's request for entry of judgment in her favor should be denied; and this case should be remanded for further findings.

## I.  BACKGROUND

On December 15, 2004, Plaintiff brought suit against UNUM, NANA, and the NANA/Colt's Short- and Long-Term Disability Plans for unlawful denial of benefits under 29 U.S.C. § 1132(a)(1)(B) and for equitable relief. On March 23, 2005, the Court dismissed Plaintiff's claim for equitable relief in Count II. (Doc. No. 11). On May 4, 2005, the Court dismissed NANA and the NANA/Colt's Short- and Long-Term Disability Plans from the suit for lack of personal

jurisdiction.   (Doc. No. 12).   Only Plaintiff's claim to recover benefits under 29 U.S.C. § 1132(a)(1)(B) remains against UNUM.

Plaintiff was employed by NANA Regional Corporation, Inc., ("NANA") as an account clerk. *See* UASP 001 & UACL 00041, 00108, 00119.[1]  NANA provided Plaintiff with short-term disability insurance through UNUM.  *See* UASP 001.  Following a diagnosis of possible multiple sclerosis ("MS"), Plaintiff applied for short-term disability ("STD") benefits.  *See* UACL 00007.  Although UNUM paid Plaintiff benefits for the period from August 1, 2001, through September 11, 2001, UNUM denied Plaintiff further short-term disability benefits.  *See* UACL 00006-7.  Plaintiff appealed that decision to this Court.

### A.   <u>Factual History</u>

Plaintiff first began experiencing symptoms associated with her current illness in 1984 with the acute onset of left thigh numbness that lasted two weeks.  UACL 00078.  Following that episode, she had relapsing, remitting episodes of left leg numbness and dizziness.  *Id.*  In 1998, Plaintiff had difficulties with her right eye, which spread to facial pain and stiffness in her neck and shoulder, accompanied by vertigo.  *Id.*  On February 27, 1998, Plaintiff underwent an MRI, the results of which were considered suspicious for MS.  UACL 00077.

In August 2000, Plaintiff again developed left leg numbness in her entire left leg.  UACL 00078.  A week later, she began to have pain in her leg and hip as well as lumps in the muscles of her thigh.  *Id.*  The pain spread to both legs, but later subsided so that her numbness was confined to her

---

[1]It is unclear from the record when Plaintiff began working at NANA.  An "STD Claim Summary" prepared by UNUM lists Plaintiff's hire date as April 9, 2001.  UACL 00046.  Another UNUM form entitled "Claim Documentation," however, lists Plaintiff's date of hire as October 11, 2000.  UACL 00042.

left lateral thigh. *Id.* Plaintiff underwent another MRI on October 20, 2000. *See* UACL 00110. The report following the MRI concluded that a "demyelinating process could not be excluded." *Id.* Dr. Lawrence P. Wood compared the October 20, 2000 MRI results to Plaintiff's previous MRI from February 27, 1998, and determined that a couple abnormal foci of high signal had increased in size, but that the other foci appeared stable and unchanged. UACL 00111.

On July 2, 2001, Dr. James Bowen, at the University of Washington Medical Center, evaluated Plaintiff for possible MS. UACL 00075-78. Plaintiff complained of weakness in her arms and legs, reduced stamina, a feeling of stiffness, numbness in her left lateral thigh, a buzzing sensation in her left hip and groin, and burning and pain in her hips and shoulders. UACL 00077. Plaintiff reported that she had developed a slight tremor of her right hand that was especially notable when she tried to use a computer mouse. *Id.* She further noted a decrease in concentration at work, a feeling of vertigo that waxed and waned, difficulty sleeping, and fatigue that was a "major problem for her." *Id.* Plaintiff told Dr. Bowen that she was moving to Albuquerque in about three weeks and that she did not then have a job in Albuquerque. UACL 00076.

In addition to reviewing Plaintiff's history of her present illness, her current symptoms and medications, her family history, her social history, and her MRIs, Dr. Bowen conducted a physical examination of Plaintiff. *Id.* The results of Dr. Bowen's examination were as follows: right leg was slightly weaker than the left; normal upper extremity strength; normal sensory exam with exception of left lateral thigh which "has slight decrease in light touch and pinprick;" accurate finger-to-nose, heel-to-shin, fast finger and rapid alternating movements; normal gait, heel-toe, and tandem walk; and brisk reflexes. *Id.* Based on his total evaluation, Dr. Bowen suspected that Plaintiff did have MS and recommended that she pursue additional testing, including somatosensory and visual evoked

potentials ("SEP" and "VEP", respectively) and neuropsychological testing. UACL 00075-76. Dr. Bowen also noted that Plaintiff was considering applying for disability at work and that Plaintiff's cognitive change, fatigue, decreased motor stamina, and motor difficulties were impairing her job performance. UACL 00075.

Around this time, Plaintiff applied for short-term disability benefits from UNUM. *See* UACL 00039.[2] On July 9, 2001, Plaintiff signed a medical release form for UNUM, but did not fax it to UNUM until August 1, 2001. *See* UACL 00146. Plaintiff's last day of work was on July 16, 2001. UACL 00039. UNUM considered Plaintiff's date of disability to be July 17, 2001. *See* UACL 00122-23.

Dr. Bowen's Attending Physician's Statement ("APS") dated July 23, 2001, gave Plaintiff a physical impairment of "Class 5 – Severe limitation of functional capacity; incapable of minimum sedentary activity." UACL 00122-23 (referring to July 23, 2001 record).[3] The report also ranked Plaintiff's mental impairment as "Class 3 – Able to engage in only limited stress situations." *Id.* The report listed Plaintiff's symptoms as "weakness, ataxia, fatigue, decreased cognition." *Id.*

Sometime after Plaintiff submitted her claim to UNUM, it appears that UNUM lost her claim file. UACL 00035. Plaintiff apparently complained to UNUM that it lost her file, and on or about

---

[2]Plaintiff's application form for short-term disability benefits is not in the administrative record. The record does not demonstrate on what exact date Plaintiff applied for benefits, but it appears to have been after her July 2, 2001 visit with Dr. Bowen. The record suggests that Plaintiff made her claim for disability sometime on or around July 17, 2001, the date of her disability and the day after her last day worked. *See infra.*

[3]A number of records in Plaintiff's claim file refer to Dr. Bowen's July 23, 2001 APS. *See*, *e.g.*, UACL 00085, 00108, 00122. Although the statement itself is not in the administrative record filed with the Court, it appears that UNUM was aware of the contents of the statement and considered it when reviewing Plaintiff's claim. *See id.*

October 10, 2001, UNUM rushed to recreate her file.  *See id.*[4]

By letter dated October 10, 2001, UNUM informed Plaintiff that it had approved her benefits from August 1, 2001, through September 11, 2001.  UACL 00039.  UNUM also told Plaintiff that it had requested additional medical information from Dr. Bowen to support her continued disability and to see how her medical condition affected her work capacity.  *Id.*  UNUM specified that it wanted the following medical evidence:  all medical records from all treating providers from August 1, 2001, to the present; a list from her doctor of all activities she could not do and the medical reasoning supporting the restrictions and limitations; the enclosed physical capacities evaluation form; a copy of her treatment plan and return to work plan; and results of all recent X-rays, MRIs, CT Scans, etc. UACL 00038.   UNUM warned Plaintiff that benefits would not be considered beyond September 11, 2001, unless UNUM received the additional medical information.  *Id.*  UNUM stated that it would review the materials and make a determination concerning an extension of her benefits.  *Id.*

On October 16, 2001, UNUM sent Dr. Bowen a letter requesting all Plaintiff's medical records from August 1, 2001, to the present.  UACL 00148.  On October 19, 2001, Dr. Bowen faxed to UNUM a Physical Capacities Evaluation for Plaintiff that he prepared that day.  WOLFF, 00001-03.  According to Dr. Bowen, Plaintiff, in an eight-hour work day, could sit continuously for two hours, and stand and walk continuously for one hour each.  WOLFF, 00003.  Plaintiff could push, pull, lift, or carry up to 10 pounds, but she could never continuously balance, stoop, kneel, crouch, crawl, reach overhead, or climb.  *Id.*  In Dr. Bowen's estimation, Plaintiff also could not use both hands continuously for fine manipulation, medium dexterity, power grip, push/pull, or forearm

---

[4]The loss of the claim file seems to explain why Plaintiff's application and Dr. Bowen's APS is missing from the administrative record.

rotational movement. *Id.* He noted that Plaintiff had restrictions for activities involving unprotected heights and moving machinery. WOLFF, 00002. Dr. Bowen described Plaintiff's treatment plan at the time as "medications," and noted that she was on five different types of medication. *Id.* Dr. Bowen stated that Plaintiff was "not expected to recover." *Id.*

On October 23, 2001, Plaintiff returned for a follow-up visit to Dr. Bowen. Dr. Bowen noted that Plaintiff's history of disseminated attacks in space and time and her MRI were consistent with "possible multiple sclerosis." UACL 00127. He noted that her symptoms remained unchanged, and that he did not repeat a physical examination. *Id.* He also reported that when he last saw her, he had suggested several tests, but that she had not had these tests performed yet. *Id.* He also stated that he provided her a prescription for Avonex. *Id.*

On November 8, 2001, Plaintiff underwent a psychological evaluation, including a "mini" mental status examination, clinical interview, and Wechsler Adult Intelligence Scale-III test, conducted by Tony Kreuch, a clinical neuropsychologist. UACL 00116-19. The Disability Determination Services of New Mexico ("DDS") referred Plaintiff to Dr. Kreuch for the assessment in order to determine whether Plaintiff was entitled to social security benefits. *See* UACL 00119. Plaintiff reported to Dr. Kreuch that she had a history of seizure disorder and was recently diagnosed with MS. *Id.* She also stated that she was having the following symptoms: numbness in her left leg, in addition to pain, word finding problems, poor concentration, a lack of stamina, and fatigue. *Id.* Due to weakness in her legs, Plaintiff switched from a manual to an automatic transmission, but has no problems driving. UACL 00118. Plaintiff reported that her sleep has "historically been poor." *Id.* Plaintiff's energy level was variable, depending on how much she can sleep, but she maintains a "good activity level in general." *Id.* Plaintiff stated that her current medications included Neurontin,

6

Elavil, Effexor, and that she was preparing to start on Avonex as well.  *Id.*

After Plaintiff's psychological evaluation, Dr. Kreuch concluded that Plaintiff was functioning at an average level intellectually, had relatively well-developed verbal abilities, had excellent arithmetic reasoning skills, and had overall attention and concentration abilities within the functional limits.  UACL 00116-00117.  However, Dr. Kreuch's most salient finding was that Plaintiff had a "reduced speed of processing, a finding that is common in individuals with the diagnosis of multiple sclerosis."  UACL 00116.  Dr. Kreuch's diagnostic impression was an Axis I cognitive disorder NOS, mild related to speed of processing deficits.  UACL 00117.

Dr. Kreuch also completed a DDS form.  *See* UACL 00113-15.  Dr. Kreuch noted that Plaintiff was "mildly limited" in understanding and remembering detailed or complex instructions, in her ability to attend and concentrate, and in her ability to adapt to changes in the workplace because of her reduced cognitive efficiency.  *See* UACL 00114-15.  "Mildly limited" was defined as "the effects of the mental disorder do not significantly limit the individual from consistently and usefully performing the activity."  UACL 00115.  Dr. Kreuch, however, also found that Plaintiff was "not limited" as to understanding and remembering short and simple instructions, her ability to carry out instructions, her ability to work without supervision, and in her ability to socially interact with other people. UACL 00114-15.  He also found that she was capable of managing her own benefits.  UACL 00114.

On November 11, 2001, Plaintiff underwent another MRI.  UACL 00112.  The radiology report stated that the "number and size of white matter plaques appears the same as the 10/20/2000 study."  *Id.*  The report also noted that there was no evidence of "any focal enhancement in these plaques" or of "any abnormal enhancement."  *Id.*  The report concluded that the MRI showed "stable,

multiple periventricular and subcortical white matter plaques, consistent with the diagnosis of demyelinating disease." *Id.*

In response to UNUM's requests for medical records, on November 16, 2001, the University of Washington Medical Center sent UNUM copies of Plaintiff's clinic notes. UACL 00130, 00136-37. The clinic notes were Dr. Bowen's notes from his October 23, 2001 examination of Plaintiff. *See* UACL 00126-27. UNUM received the clinic notes on November 27, 2001. *See* UACL 00130.

On December 4, 2001, Ruth Brown, RN, MSN, conducted an initial medical review of Plaintiff's file. UACL 00121-22. She reviewed Dr. Bowen's July 23, 2001 report, his October 19, 2001 report, and his October 23, 2001 clinic note. UACL 00122. Ruth Brown recommended that UNUM obtain all Plaintiff's current medical reports, including Dr. Bowen's July 2, 2001 report, which was apparently referenced on the APS, and medical reports from Plaintiff's Albuquerque doctors, as well as all tests and diagnostic reports, including Plaintiff's MRI. UACL 00121.

On December 7, 2001, Plaintiff faxed UNUM copies of Dr. Kreuch's November 8, 2001 evaluation; the DDS form he completed; the November 11, 2001 Radiology Report; the report comparing Plaintiff's October 20, 2000 MRI with her February 27, 1998 MRI; and the report detailing the October 20, 2000 MRI results. *See* UACL 00110-20.

On December 12, 2001, Kay O'Reilly, RN, MSN, conducted a medical review of Plaintiff's file. *See* UACL 00107-08. She evaluated, among other things, Plaintiff's medical history; Dr. Bowen's July 23, 2001, October 19, 2001, and October 23, 2001 reports; Dr. Kreuch's psychological evaluation and DDS form; Plaintiff's Oct. 20, 2000 MRI and comparison; her Nov. 11, 2001 MRI and comparison; and statements by Plaintiff and her employer. UACL 00108. Kay O'Reilly concluded that Plaintiff's restrictions and limitations were not supported by the available information.

8

UACL 00107.  Kay O'Reilly explained that there had been no significant change in Plaintiff's MRI from October 2000 to November 2001, she had mild deficits in processing speed but average function on all other IQ portions, she had no physical exams but reported to Dr. Kreuch that she was highly functional physically, the SEP and VEP recommended in October 2001 were not available for review, there had been no significant changes in her medications, and there was no indication of a MS flare requiring steroid administration.  *Id.*  Kay O'Reilly noted that there were no physical exams on file to indicate a worsening of Plaintiff's condition and that Mr. Kreuch had not documented any obvious physical observations, such as ataxia, unstable gait, etc.  *Id.*  Kay O'Reilly noted that Plaintiff had moved from Alaska to New Mexico sometime between August and October 2001.  *Id.*  Kay O'Reilly indicated that further consideration would require records from Dr. Bowen from July 2001 forward, records from Plaintiff's New Mexico doctors from July 2001 forward, and any and all diagnostics. *Id.*

On December 13, 2001, Dr. Debra H. Kile, MD, noted that she concurred with the review, that there was inadequate information currently on file to assess Plaintiff's restrictions and limitations, and that Plaintiff's psychological evaluation did not show evidence of significant functional impairment.  UACL 00106.  Dr. Kile stated that she attempted to get additional SEP and VEP records from Dr. Bowen's office but was unsuccessful.  *See id.*  She also noted that there were no available records from Plaintiff's New Mexico doctors and that it did not appear that Plaintiff had begun Avonex therapy as of the date of her November 8, 2001 psychological evaluation.  *Id.*

On December 15, 2001, Plaintiff sent a fax to UNUM requesting a copy of the Summary Plan Description ("SPD") for her short- and long-term disability plans.  UACL 00104-05.  Plaintiff re-faxed this same request to UNUM on January 18, 2002.  UACL 00102-03.  A UNUM form indicates

that it received Plaintiff's request for her SPD on January 18, 2002.  *See* UACL 00019.  The record

does not show that UNUM sent a copy of the SPD to Plaintiff, although the record does report under

status, "Completed."  *See id.*

      In a letter dated February 27, 2002, UNUM informed Plaintiff that it had completed its review

of her short-term disability claim and that it was "unable to continue benefits beyond September 11,

2001."  UACL 00101.  The letter provided the definition of "total disability and totally disabled" and

informed her that her medical records did not substantiate an impairment from performing the

material duties of her occupation.  UACL 00100.  UNUM told Plaintiff that its medical department

had reviewed her three MRIs; Dr. Kreuch's November 8, 2001 psychological evaluation; Dr.

Kreuch's November 12, 2001 DDS report; and done "a comprehensive review of [her] file."  UACL

00100-01.  In determining that there were "no restrictions or limitations which would preclude

[Plaintiff] from performing the material duties of [her] occupation," the letter explained:

> There was no change in the October 2000 and November 2001 MRI's.  There were
> also no physical examinations on file to indicate a worsening in your condition of
> [MS].  In addition, Dr. Kreuch indicated that your cognitive impairment was mild and
> only for the processing of speed.  There have been no significant changes in your
> medications and there are also no indications of a [MS] flare up requiring steroid
> administration.  Medical evidence in file further reveals that you have had since 1984
> and you have had MRI's for [MS] since 1998, however there was no medical
> information provided to support the worsening of your condition of [MS] as of July
> 2001.  Furthermore, medical information in file revealed that your symptoms are not
> severe enough to preclude you from performing your occupation.  Therefore no
> further benefits are payable beyond September 11, 2001 and we are closing your claim
> as you no longer meet the above definition of disability.

UACL 00100.  The letter informed Plaintiff that she could send additional information to UNUM for

review, that she could appeal the decision by written appeal within 90 days of the date of the letter,

and that she could request copies of documents contained in her claim file that were pertinent to the

denial decision.  UACL 00099-100.

By letter dated May 6, 2002, Plaintiff notified UNUM of her appeal of its decision, that she was going to undergo additional testing on June 13, 2002, and that she would send the results to UNUM when they were available.  UACL 00098.  Plaintiff also requested copies of documents contained in her claim file that were pertinent to UNUM's decision denying further benefits.  *Id.*  In addition, Plaintiff attached a letter dated April 10, 2002, from Dr. Bowen stating that Plaintiff suffers from MS and describing some of her physical symptoms, including decreased stamina in her arms and legs, spastic leg jumps, loss of fine motor control, a tremor in her right hand, fatigue, waxing and waning vertigo, and cognitive impairment.  UACL 00097.  Dr. Bowen said that Plaintiff's fatigue impaired her ability to work.  *Id.*  Dr. Bowen also explained that Plaintiff's intelligence test results were consistent with other MS patients.  *Id.*  He recommended further evaluation and neuropsychological testing be done "in areas that are more likely to be affected with her disease." *Id.*  UNUM received Plaintiff's request for review on May 9, 2002.  UACL 00098.

On June 17, 2002, UNUM acknowledged receipt of Plaintiff's May 6, 2002 letter, and told her it would "be happy to send information in your file to you.  Please specify what you would like a copy of and we will send you the requested documents."  UACL 00095.  UNUM also told Plaintiff to send the results of her testing as soon as possible and that it would try to make a determination within 60 days of its receipt of her appeal unless special circumstances required an additional 60-day extension of time.  *See id.*

On June 13, 2002, and July 11, 2002, Mary Pepping, PhD., conducted a neuropsychological examination of Plaintiff.  UACL 00091.  Plaintiff noted that she was concerned about her concentration, judgment, and memory.  *Id.*  Plaintiff stated that she was not aware of errors she was

11

making at work until her supervisor informed her that she had not been carrying out her duties as expected. *Id.* Plaintiff also noted that she had problems when there was pressure to do something quickly and felt overwhelmed when there was background music, bright lights, and many people talking or moving. *Id.* During the testing, Dr. Pepping noted that Plaintiff was fatigued in the afternoon after only two hours of testing. *Id.*

Plaintiff reported to Dr. Pepping that she was experiencing a tremendous amount of fatigue, although not every day, even when getting normal amounts of sleep. UACL 00090. Plaintiff complained of stiffness and burning in her shoulder, numbness at times in her right arm, numbness in her left thigh, and some difficulty with her left leg, although she is able to walk fairly well but with an occasional limp. *Id.* Plaintiff stated that a year ago she began to develop a mild tremor in her right hand. *Id.*

Dr. Pepping conducted a number of neuropsychological tests on Plaintiff. *See* UACL 00089-90. Based on the tests, Dr. Pepping concluded that Plaintiff exhibited many excellent basic academic skills and good verbal memory performance on highly structured tasks, but that she also displayed "some significant complex verbal memory retrieval deficits, subtle planning and organizing difficulties, some reduced awareness of mistakes, problems with trial and error feedback, some reduction in verbal inference, some subtle reductions in visual motor speed of information processing, and very significant fatigue for a person of her age." UACL 00088-89. Dr. Pepping found that, among the clinical scales, "there are elevations on measures of depression, and [a] number of physical and somatic symptoms." UACL 00089. Dr. Pepping additionally determined that Plaintiff had "subtle motor planning difficulties." UACL 00090. Dr. Pepping noted that all of these symptoms were consistent with MS-related changes. *Id.* Finally, Dr. Pepping stated: "While no single one of these

12

deficits would render Ms. Wilmon incapable of full-time, competitive employment, the combination of subtle changes in cognition, behavioral regulation, fatigue, and speed of thinking, make it unlikely that she could withstand full-time, competitive work." UACL 00088. UNUM received Dr. Pepping's report on July 12, 2002. *See* UACL 00008.

On July 23, 2002, Susan M. Fred, RN, MSN, reviewed Plaintiff's claim file after receiving Dr. Bowen's April 10, 2002 letter and Dr. Pepping's report. UACL 00084-85. She noted that the new medical documentation did not support a change in condition and disability as of July 16, 2001. UACL 00085. She referred the file to a psychiatry consultant. UACL 00084.

On July 29, 2002, Glenn E. Higgins, Ph.D., reviewed Dr. Kreuch's Nov. 8, 2001 psychological evaluation and Dr. Pepping's July 11, 2002 neuropsychological evaluation. *See* UACL 00071-74. Dr. Higgins noted that Dr. Kreuch's "brief" evaluation was limited to assessment of intellectual capacity, and that Plaintiff at the time of the evaluation appeared unremarkable and consistent with work capacity. UACL 00072, 00074. Dr. Higgins, however, determined that Dr. Pepping's evaluation did not include complete data for independent analysis, and thus, it was not possible to discuss her findings in detail. *Id.* Dr. Higgins nonetheless stated that he thought Dr. Pepping's opinion as to Plaintiff being incapable of competitive employment was overly restrictive. *Id.* Dr. Higgins concluded that as of November 2001, Plaintiff "exhibited neurocognitive occupational capacity at that time" and that Dr. Pepping's evaluation only provided a "snapshot" of Plaintiff in July 2002, and did not address her cognitive status in the fall of 2001. UACL 00071. Dr. Higgins felt that there were a number of non-medical factors that might be the primary reason for Plaintiff's decision not to return to work. *Id.* There is nothing in the administrative record suggesting that UNUM ever requested or received Dr. Pepping's underlying data.

13

On July 30-31, 2002, Dr. Kile reviewed Plaintiff's file again, including the additional information provided in Dr. Bowen's July 2, 2001 report and April 2002 letter, and continued to conclude that Plaintiff had not adequately shown that her condition was severe. *See* UACL 00081-83. Dr. Kile felt that the lack of MS medication treatment from July 2001 through at least October 2001 and the lack of steroid treatments suggested a lack of severity in Plaintiff's condition. *See id.* Dr. Kile noted that the gap in treatment from October 2001[5] until June 2002 also suggested a lack of severity. *See* UACL 00082. Although Dr. Kile acknowledged Plaintiff's symptoms of leg numbness, decreased stamina and concentration, fatigue, and episodic dizziness/vertigo, she noted that Plaintiff had various such symptoms over the years and that there was nothing to indicate a progression of the disease or significant functional impairment at the time Plaintiff went on disability. *See* UACL 00083. Dr. Kile found that the November 2001 and October 2000 MRI comparisons also suggested a lack of progression of the MS. *Id.* Dr. Kile also concluded that the July 2, 2001 physical examination demonstrated that there was nothing to preclude Plaintiff from sedentary to light work activity. *Id.* Moreover, Dr. Kile determined that Dr. Kreuch's evaluation showed only mild cognitive deficit inconsistent with significant impairment. *See* UACL 00081-82. Dr. Kile also believed that Plaintiff's moving to Albuquerque indicated a "lifestyle choice and possible role of secondary gain." UACL 00082. Furthermore, Dr. Kile noted that the records indicated that Plaintiff stated she was applying for disability; there is no indication that her treating physician advised her to go on disability. UACL 00083.

In addition, Dr. Kile stated that Plaintiff saw a neurologist in Albuquerque with whom she did

---

[5]Dr. Kile's report actually refers to the October date as "10/23/02." UACL 00082. Based on the record and the fact that Dr. Kile's report was made on July 30, 2002, the reference appears to be a typographical error that should refer to 10/23/01.

not hit it off, but that there were no records from the other treating neurologist on file.  UACL 00082.

Dr. Kile thought that it would be helpful to obtain the record of the other neurologist, if possible.

*Id.*  The administrative record does not indicate, however, that UNUM ever requested or received

this additional record.

By letter dated September 10, 2002, UNUM notified Plaintiff that it had completed its

appellate review of her short term disability claim and concluded that its decision terminating her

claim was appropriate.  UACL 00007.  The letter explained that UNUM's neuropsychologist,

psychiatrist, and internist had reviewed records from Dr. Pepping, Dr. Bowen, Dr. Gregg, and Dr.

Kreuch and concluded that Plaintiff's impairment did not prevent her from working, particularly on

and around her date of disability.  *Id.*  The letter also provided Plaintiff with a summary of UNUM's

reasons for denying benefits.  *See* UACL 00006-07.  UNUM noted that as a customer service to

Plaintiff, it was not requesting reimbursement of benefits paid to her from August 1 through

September 11, 2001.  UACL 00006.  As noted above, only Plaintiff's claim to recover benefits under

29 U.S.C. §  1132(a)(1)(B)  remains against UNUM.

**B.**     **Short Term Disability Policy**

The STD policy issued to Plaintiff provides that the insurer will pay a weekly benefit to the

employee "if the employee as a result of an injury or a sickness:

1. becomes totally disabled while insured;
2. requires the regular care of a physician; and
3. submits proof of his total disability."

UASP 013.  Under the STD policy, the terms "total disability" and "totally disabled" mean "as a

result of sickness or injury the employee is unable to perform each of the material duties of his regular

occupation."  UASP 010.

15

The policy provides that the employee must give UNUM proof of the employee's claim "within 90 days following the end of the first weekly period for which the Insurance Company is liable." UASP 017. "Continuing proof of total disability and regular attendance of a physician must be given to the Insurance Company within 30 days after the requested date for that proof." *Id.* The policy does provide, however, that, if it is not possible to give proof within this time limit, it must be given as soon as reasonably possible. *Id.* Additionally, the policy states that the UNUM, at its own expense, has the right and opportunity to have an employee with a pending claim examined by a physician of UNUM's own choice. UASP 018. As to the insurer's discretionary authority, the STD policy provides: "In making any benefits determination under this Policy, the Insurance Company shall have the discretionary authority both to determine an employee's eligibility for benefits and to construe the terms of this Policy." UASP 007.

## II.   DISCUSSION

UNUM's short-term and long-term disability policies are governed by the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal citations and quotation marks omitted). Plaintiff's suit arises under 29 U.S.C. § 1132(a) of ERISA, which provides that a beneficiary may bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In determining whether Plaintiff is entitled to benefits under the policy, the Court must begin its analysis by examining the appropriate standard of review to apply in this case.

16

A. **Standard of Review**

A denial of benefits claim must be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone*, 489 U.S. at 115. There is no dispute in this case that both the short- and long-term disability plans expressly give UNUM discretion to make determinations under the terms of the plan. *See* Pl.'s Opening Br. to Overturn Administrator's Decision (Doc. No. 28) at 2. Where the plan gives the administrator discretionary authority to interpret the terms of the plan, the Court generally must apply the arbitrary and capricious standard of review. *Allison v. Unum Life Ins. Co. of America*, 381 F.3d 1015, 1021 (10th Cir. 2004). Under the arbitrary and capricious standard, the court must uphold the decision unless it is not grounded on any reasonable basis. *Kimber v. Thiokol*, 196 F.3d 1092, 1098 (10th Cir. 1999). In reviewing the administrator's decision under the arbitrary and capricious standard, courts are limited to the materials in the administrative record. *Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997, 1003 (10th Cir. 2004).

The Tenth Circuit applies a less deferential standard of review, however, when the plan administrator has denied coverage and one of three circumstances exist: (1) an inherent conflict of interest, such as when the decision-maker is both the insurer and administrator of the plan; (2) a proven conflict of interest; or (3) a serious procedural irregularity. *Id.* at 1006. When one of these scenarios exist, the court must apply a "sliding scale" approach in which the court decreases the level of deference given to the decision in proportion to the seriousness of the conflict. *See id.* at 1003-04. Under this less deferential standard, the plan administrator bears the burden of proving the reasonableness of its decision under the traditional arbitrary and capricious standard. *Id.* at 1006. The plan administrator "must demonstrate that its interpretation of the terms of the plan is reasonable

17

and that its application of those terms to the claimant is supported by substantial evidence." *Id.* A court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest. *Id.* at 1006.

Moreover, in cases where "substantial violations of ERISA deadlines result in the claim's being automatically deemed denied on review, the district court must review the denial *de novo*, even if the plan administrator has discretionary authority to decide claims." *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003). The Tenth Circuit cautioned, however, that its holding did not require "a hair trigger rule" such that *de novo* review must be applied in every case in which the decision came late. *Id.* at 635. The court noted that ERISA was designed "to promote accurate, cooperative, and reasonably speedy decision-making." *Id.* The *Gilbertson* court did not want a hair-trigger rule that could inhibit the collection of useful evidence. *See id.* The Tenth Circuit thus followed a "substantial compliance" approach: "in the context of an ongoing, good faith exchange of information between the administrator and the claimant, inconsequential violations of the deadlines or other procedural irregularities would not entitle the claimant to *de novo* review." *Id.* at 634, 635.

In this case, Plaintiff offers two alternative arguments as to the standard of review. First, Plaintiff claims that the Court should apply the *de novo* standard in this case because it alleges that UNUM committed a number of procedural errors when administering its decision. Second, Plaintiff contends that, if the Court applies the arbitrary and capricious standard of review, the Court should give minimal deference to UNUM because UNUM is a for-profit corporation and is acting both as the insurer and administrator of the plan, which creates an inherent conflict of interest. The Court

will examine these arguments in turn.

### 1.    Applicable ERISA Regulations

ERISA sets certain minimum requirements for a plan's claim procedures and notification to ensure full and fair review of benefit denials. *See Aetna Health, Inc. v. Davila*, 542 U.S. 200, 220 (2004). Plaintiff points to a number of procedural irregularities that she argues support the application of *de novo* review in this case. Most of the alleged procedural violations involve violations of the Department of Labor ("DOL") ERISA regulations. The DOL ERISA regulations were amended in November 2000. The amendments, however, only applied "to claims filed under a plan on or after January 1, 2002." 65 Fed. Reg. 70265, 70271 (Nov. 21, 2000). In this case, Plaintiff filed her claim for short-term disability benefits on or around July 17, 2001; therefore, the 2000 DOL regulations apply to this case. *See Finley v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 379 F.3d 1168, 1171 n.2 (10th Cir. 2004) (older DOL regulations applied where claim for benefits was filed prior to January 1, 2002). The Court will therefore look to the 2000 DOL regulations when examining Plaintiff's arguments.

### 2.    Whether UNUM Violated ERISA's Time Deadlines Requiring *De Novo* Review

Plaintiff argues that UNUM's denial of benefits did not comply with the DOL regulation providing that the initial written denial of benefits must be furnished to the claimant within 90 days after receipt of the claim. Plaintiff contends that UNUM's February 27, 2002 denial letter was furnished to Plaintiff well after 90 days from when she submitted her claim. UNUM argues, however, that it initially denied Plaintiff's claim in its October 10, 2001 letter to her, and then denied her claim a second time in the February 27, 2002 letter. UNUM asserts that both notifications were timely.

In determining whether UNUM's notification was timely, the Court must decide when UNUM notified Plaintiff of its decision to deny benefits.  The Court cannot agree with UNUM's argument that the October 10, 2001 letter functioned as the initial denial of Plaintiff's claim.  The letter stated: "Based on the current information in our claim file, your benefits have been approved through September 11, 2001."  UACL 00039.  The letter then explained that UNUM was requesting additional medical information to determine how her medical condition continued to affect her work capacity and listed specific information it wanted.  UACL 00038-39.  The letter concluded: "Benefits will not be considered beyond September 11, 2001 unless we receive and review additional medical information.  Upon completion of our review, we will make a determination concerning an extension of your benefits.  If we do not receive the additional information within 21 days from the date of this letter, your file will be closed."  UACL 00038.  Although the letter indicated that UNUM was considering denying continued benefits, it nowhere expressed UNUM's position that it had made a decision to deny benefits after September 11, 2001.  Instead, UNUM made clear that it was "consider[ing]" whether to give continued benefits and that it would "make a determination" after "completion of [its] review."  *Id.*  The October 11, 2001 letter therefore cannot be construed as notice of UNUM's decision to deny benefits past September 11, 2001.

Moreover, the language of the February 27, 2002 letter supports this interpretation.  That letter began:  "We have completed our review of your Short Term disability claim and are unable to continue benefits beyond September 11, 2001."  UACL 00101.  This letter served as the first written communication to Plaintiff that conveyed UNUM's decision to deny her benefits after September 11, 2001.  The February 27, 2002 letter is therefore the first notification of UNUM's decision to deny benefits, and the Court must examine this letter in determining whether UNUM complied with

20

ERISA's timing and content requirements.

The DOL regulations require that notice of a decision denying benefits "shall be furnished to the claimant within a reasonable period of time after receipt of the claim by the plan." 29 C.F.R. § 2560.503-1(e)(1) (2000). A claim "is a request for a plan benefit by a participant or beneficiary." *Id.* § 2560.503-1(d). A period of time is "deemed to be unreasonable if it exceeds 90 days after receipt of the claim by the plan, unless special circumstances require an extension of time for processing the claim." *Id.* § 2560.503-1(e)(3). If an extension of time is needed, written notice of the extension must be furnished to the claimant prior to the termination of the initial 90-day period, and the notice must indicate the special circumstances requiring the extension as well as the date on which the plan expects to render a final decision. *Id.* The extension cannot exceed a period of 90 days from the end of the initial period. *Id.*

In this case, it is unclear from the administrative record when UNUM received Plaintiff's claim, which would start the clock running. The administrative record does not indicate the exact date on which UNUM received Plaintiff's request for disability benefits, as Plaintiff's application for benefits is missing from the record. UNUM nonetheless uses July 17, 2001, Plaintiff's claimed disability date, as the date on which the time for its initial claim decision began to run. *See* UNUM's Resp. to Pl.'s Opening Br. to Overturn Administrator's Decision (Doc. No. 33) at 22. Plaintiff, in contrast, uses either August 1, 2001, or September 11, 2001, as the date on which time begins to run. *See* Pl.'s Opening Br. (Doc. No. 28) at 21. There is one statement in the record that indicates that the July 17, 2001 date is the approximate date on which Plaintiff applied for benefits. *See* UACL 00083 ("Initial visit [7/2/01] states clmt 'is considering applying for disability at work' . . . forms for disability not completed until 3 weeks after visit."). Based on this statement in the record as well as

the facts that UNUM appears to consider July 17, 2001, as the date on which the clock should run and that Plaintiff does not suggest that an earlier date applies, the Court will consider July 17, 2001 as the date on which the time for notification began to run.

UNUM's deadline under the regulations to notify Plaintiff of the denial of her claim was 90 days after July 17, 2001, which would have been October 15, 2001. However, on October 10, 2001, five days before the deadline, UNUM informed Plaintiff that it approved her benefits through September 11, 2001, but had not yet approved her benefits beyond that date. UNUM requested additional information from Plaintiff and her attending physician, Dr. Bowen.

The Court finds that the October 10, 2001 letter effectively served as written notice of UNUM's need for an extension of time to process Plaintiff's claim. DOL regulations permit an insurer an extension of time to process a claim, so long as the insurer provides the claimant, prior to the expiration of the initial 90-day period, written notice of "the special circumstances requiring an extension of time and the date by which the plan expects to render the final decision." 29 C.F.R. § 2560.503-1(e)(3). Although UNUM did not tell Plaintiff in the October 10, 2001 letter the time and date by which it expected to render a final decision, the letter nonetheless effectively notified Plaintiff that UNUM needed an extension of time to decide Plaintiff's claim because of a lack of medical information submitted by Plaintiff. The Court thus finds that the letter substantially complied with 29 C.F.R. § 2560.503-1(e)(3) sufficient to extend UNUM's deadline for decision by an additional 90 days following the end of the initial 90-day period. *Cf. Gilbertson*, 328 F.3d at 629, 631 (plan administrator's fax to claimant extending deadline for additional submissions could be construed as notice that it would need 60-day extension or as tacit agreement to re-start clock on deadline or date of claimant's final submission).

The Court also finds that the October 10, 2001 letter permitting Plaintiff to submit additional information tolled the initial 90-day period until Plaintiff submitted the additional information she wished UNUM to review.  Although the regulations in effect at the time Plaintiff filed her claim are silent as to whether the time limits should be tolled, the new regulations promulgated by the DOL expressly provide for the tolling of the period from the date on which the notification of extension is sent to the claimant until the date a claimant has furnished the additional information necessary to process a claim.  29 C.F.R. § 2560.503-1(f)(4) (2002).  Although the new regulations do not apply to the case at hand, courts have applied tolling in cases under the older regulations.  *See Gilbertson*, 328 F.3d at 636 (indicating that plan administrator's extension of time for claimant to submit additional medical information tolled running of deadline such that clock would not begin to run until last date of extension or until date of claimant's final submission of information); *Evans v. American Express Financial Corp. Long-Term Disability Plan*, 2003 WL 23126327, at 7-8 (M.D. Tenn. Nov. 5, 2003) (unpublished opinion) (tolling plaintiff's claim for disability benefits that was filed on June 14, 1999, for period of time between notification that additional information was required until date claims file contained all medical information necessary to process claim).  Following the receipt of the October 10, 2001 letter, Plaintiff and UNUM subsequently exchanged information, culminating on December 7, 2001, when UNUM received the last of Plaintiff's submissions of medical information in order for it to conduct its initial review.  *See* UACL 00110-20.  The Court therefore finds that the period of time between October 10, 2001, and December 7, 2001, tolled the initial 90-day period.

As of October 10, 2001, 85 days had passed since Plaintiff filed her claim.  Because the period between October 10, 2001, and December 7, 2001, tolled the deadline, the initial 90-day period

would not have run until December 12, 2001.  Moreover, since UNUM had requested an additional

90-day extension, UNUM had an additional 90 days from December 12, 2001 to render its decision.[6]

UNUM thus had until March 12, 2002, to render its decision.  Accordingly, UNUM's February 27,

2002 decision denying benefits was timely and *de novo* review does not apply on this basis.  *See*

*Evans*, 2003 WL 23126327 at 8 (concluding that plan administrator's notification of denial of benefits

was timely where it notified claimant of denial within 90 days from time claimant's necessary medical

information was received and denying *de novo* review).

        Moreover, even if UNUM's initial denial was technically untimely under the DOL regulation,

the Court nonetheless finds that UNUM substantially complied with the regulation.  In order to show

substantial compliance, the delay must be (1) inconsequential and (2) in the context of an on-going,

good-faith exchange of information between the administrator and the claimant.  *Finley*, 379 F.3d at

1173-74.  Beginning with the second element, the record demonstrates that UNUM engaged in the

sort of on-going, good faith exchange of information with Plaintiff and her doctors to ensure that

UNUM had all the medical information that Plaintiff wanted it to review.  UNUM conducted the

meaningful dialogue that the ERISA regulations contemplate.  The second requirement is therefore

met.

        As to the first requirement, the Court also finds the delay in notifying Plaintiff of its initial

denial to be inconsequential because Plaintiff still had the opportunity for review on appeal.  Under

---

        [6]The Court recognizes that 29 C.F.R. § 2560.503-1(e)(3) states:  "In no event shall such
extension exceed a period of 90 days from the end of such initial period."  Because the Court
found that the initial period was tolled until December 12, 2001, the extension period, which
began on December 13, 2001, did not exceed a period of 90 days.  *Cf. Gilbertson*, 328 F.3d at
631, 636 (indicating 60-day extension permissible following tolling, even though DOL regulation
stated that decision must be rendered not later than 120 days after receipt of request for review
and even though at least 137 days would have passed following plaintiff filing her claim).

the DOL regulations, failure to notify the claimant of the denial of the claim within a reasonable time results in the claim being "deemed denied and the claimant shall be permitted to proceed to the review stage." 29 C.F.R. § 2560.503-1(e)(2). Thus, when the reasonable period of time passed for the initial decision, the claim at that time would have been "deemed denied" and Plaintiff could have immediately appealed the decision. Plaintiff did, in fact, appeal the decision, although she chose to wait until more than two months after receiving UNUM's February 27, 2002 denial before appealing, instead of appealing the decision when she believed the time for initial review ran. UNUM subsequently rendered a timely final decision denying her claim on September 10, 2002.[7] Because UNUM rendered a timely decision denying Plaintiff's appeal, the Court finds that any untimeliness in the initial decision was inconsequential. *See Evans*, 2003 WL 23126327 at 8 (noting that remedy for failure to furnish denial of claim within time limit is to proceed to review stage, not to impose *de novo* review standard).

For all the above reasons, the Court rejects Plaintiff's argument that it should apply the *de novo* review standard based on UNUM's failure to respond to Plaintiff's claim within 90 days of her

---

[7]Plaintiff did not challenge the timeliness of UNUM's decision on appeal until her reply brief. The Court need not address issues raised for the first time in a reply. *See Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005) ("Generally, the nonmoving party should be given an opportunity to respond to new material raised for the first time in the movant's reply."); *Minshall v. McGraw Hill Broadcasting Co., Inc.*, 323 F.3d 1273, 1288 (10th Cir. 2003) (argument raised for first time in reply brief is waived). The Court nevertheless finds that UNUM's decision on appeal was timely. UNUM received Plaintiff's request for appeal on May 9, 2002, in which Plaintiff stated that she would be submitting to additional testing that she would make available as soon as possible. UNUM acknowledged Plaintiff's request to submit additional materials, telling her to submit the results of her testing as soon as possible so it could review them. Plaintiff did not submit the additional medical information to UNUM until July 12, 2002. The Court finds that the period of time between May 9, 2002 and July 12, 2002 tolled the 60-day period. *Cf. Gilbertson*, 328 F.3d at 629, 631. UNUM rendered its final decision on September 10, 2002, 60 days following its receipt of Plaintiff's additional information. The appeal decision was therefore timely.

filing her claim.

**3.**      **Whether UNUM Violated Other ERISA Procedures and its Effect on the Standard of Review**

Plaintiff asserts that UNUM violated a number of other procedural requirements, compelling either reversal of the denial of benefits or the application of a *de novo* standard of review. The Court will look at each claimed violation in turn and then examine the necessary remedy for any such violations.

**a.**      **Alleged Procedural Violations**

**1)**      **Specificity of Denial**

Plaintiff contends that UNUM violated ERISA's minimum procedural requirements by failing to tell her in the initial claim denial what additional records were needed to perfect her claim and why. Plaintiff asserts UNUM should have told her in its February 27, 2002 letter that she needed tests to assess her fatigue, a report from her supervisor on her ability to perform, more neurological exams, and a medical exam from a doctor of UNUM's choice. In its response, UNUM does not specifically address the sufficiency of the denial letter.

Section 1133 of ERISA provides that a benefit plan must provide a beneficiary adequate written notice that the claim has been denied, "setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). The benefit plan must also afford a reasonable opportunity to a claimant "for a full and fair review" of the decision denying the claim. *Id.* § 1133(2). The DOL regulations further require the administrator to provide the claimant with the following:

(1) The specific reason or reasons for the denial;
(2)  Specific reference to pertinent plan provisions on which the denial is based;

 (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503-1(f) (2000).  Substantial compliance with these DOL regulations is sufficient to meet the requirements of § 1133.  *See Sage v. Automation, Inc. Pension Plan and Trust*, 845 F.2d 885, 893 (10th Cir. 1988).  The purpose of this and similar regulations is to create "a meaningful dialogue between ERISA plan administrators and their beneficiaries," *Gilbertson*, 328 F.3d at 635 (quoting *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)).

In this case, the Court finds that the February 27, 2002 letter met three of the four DOL content requirements.  The letter, however, only told Plaintiff to submit any "additional information to support [her] request for disability benefits."  UACL 00100.  This blanket request for information does not satisfy the DOL requirement  for a "description" of additional information necessary to perfect the claim and an explanation of why such material is necessary. *See* 29 C.F.R. § 2560.503-1(f)(3); *Sage*, 845 F.2d at 893-94 (letter fell short of notice requirements where it did not describe additional information needed to perfect claim or set out adequate review procedures).  Nor does the blanket request constitute substantial compliance with the requirement, where UNUM did not even attempt to describe any additional material needed to perfect the claim.  The Court therefore finds that UNUM violated 29 C.F.R. § 2560.503-1(f)(3).

### 2)        **Incomplete administrative record**

Plaintiff also complains that there is missing documentation from the administrative record regarding early medical records.  Plaintiff asserts that the record does not contain Plaintiff's application for benefits or Plaintiff's letter beginning the claim process.  Plaintiff alleges that UNUM's

failure to submit these documents in the administrative record violates 29 C.F.R. § 2560.503-1(b).

Based on the Court's review of the record, it does appear that certain documents are missing, such as Plaintiff's application for benefits and Dr. Bowen's July 23, 2001 APS. It seems that these records are missing because UNUM lost them. This fact, however, does not thereby mean that UNUM committed a procedural violation. Section 2560.503-1(b) requires every employee benefit plan to establish and maintain a reasonable claims procedure. Missing documents are not evidence that UNUM failed to establish and maintain a reasonable claims procedure. Moreover, the record shows that UNUM considered the information in Dr. Bowen's APS, even though the report itself is not part of the administrative record. *See*, *e.g.*, UACL 00122. As for Plaintiff's application, Plaintiff has not suggested that the application contained vital information not otherwise present in the administrative record. Nor is there evidence that UNUM purposefully omitted the records. The Court therefore concludes that the omission of the above-mentioned documents from the record does not constitute a violation of 29 C.F.R. § 2560.503-1(b).

### 3)   Failure to respond to Plaintiff's request for SPD

Plaintiff also asserts that UNUM never responded to Plaintiff's written request for a copy of the Summary Plan Description in violation of 29 U.S.C. § 1024(b)(4). UNUM, however, argues that it was not obligated to provide Plaintiff with the SPD because the "administrator" within the meaning of § 1024(b)(4) was Plaintiff's employer, not UNUM. Plaintiff offers no support for her assertion that UNUM was obligated to supply the SPD and appears to concede in her reply that UNUM is not so obligated under § 1024(b)(4). *See* Pl.'s Reply Br. (Doc. No. 35) at 7. Indeed, the cases relied upon by UNUM support its position that UNUM was not the "administrator" who had a duty to provide Plaintiff with the SPD under § 1024(b)(4).

Section 1024(b)(4) provides: "The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary [] plan description, . . . under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). ERISA also states that if the written plan documents do not designate a plan administrator, then the plan sponsor is the plan administrator. *Id.* § 1002(16)(A). ERISA further defines plan sponsor as the employer in the case of an employee benefit plan established or maintained by a single employer. *Id.* § 1002(16)(B)(i). In this case, the short-term disability policy does not designate a plan administrator, thus the plan sponsor is deemed to be the plan administrator. Plaintiff does not dispute that UNUM is not the plan sponsor. Therefore, UNUM was not the "administrator" within the meaning of § 1024(b)(4) and was not obligated to provide Plaintiff with a copy of the SPD. *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 104 (2d Cir. 2005) ("administrator" referred to employer who sponsored plan where plan did not specifically identify plan administrator, and thus, insurer had no disclosure obligations); *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 62 (4th Cir. 1992) (same); *Vogel v. Independence Federal Sav. Bank*, 728 F.Supp. 1210, 1226 (D. Md. 1990) (same). The fact that UNUM has administrative responsibilities with respect to reviewing claims under the policy, does not affect whether UNUM is deemed a "plan administrator" for purposes of ERISA's *notification* duties. *See Coleman*, 969 F.2d at 62. Contrary to Plaintiff's argument, the Court also does not find that UNUM's failure to provide Plaintiff with the SPD shows its intent to deny her rights under ERISA to a full and fair review of her claim.

### 4)    Failure to provide all relevant documents

Additionally, Plaintiff argues that UNUM violated ERISA procedures by not providing Plaintiff with all relevant documents, despite her request to do so. UNUM does not specifically

address this argument.

The DOL regulations in place at the time provided that every plan must establish a review procedure that allowed a claimant to review pertinent documents upon request. *See* 29 C.F.R. 2560.503-1(g)(ii). On May 6, 2002, Plaintiff requested in writing "copies of documents contained in [her] claim file which were pertinent to the denial decision." UACL 00098. Instead of directly providing Plaintiff the documents, UNUM responded by letter dated June 17, 2002, stating that it would send the information to her and asking Plaintiff to specify which documents she wanted. UACL 00095. The Court did not see anything in the record indicating that UNUM ever sent Plaintiff what she requested. Although Plaintiff never specified to UNUM which documents she wanted, the Court nevertheless finds that UNUM violated 29 C.F.R. § 2560.503-1(g)(ii) by not providing Plaintiff with the documents from her claim file that she requested. Plaintiff clearly stated that she wanted the documents "pertinent" to the denial decision and only UNUM would have known what those documents were. UNUM had no reason to require Plaintiff to submit an additional request, instead of simply providing her with the documents.

### 5)   Failure to notify of right to file suit

Finally, Plaintiff contends that UNUM violated ERISA procedures by not informing her of her right to file suit in court to appeal the administrator's final decision. Plaintiff, however, cites no statute or regulation requiring such notification, and thus, Plaintiff has not demonstrated that UNUM violated any procedure by failing to notify Plaintiff of her right to sue.

### b.   Effect of Procedural Violations

The Tenth Circuit has made clear that "[n]ot every procedural defect will upset the decision of plan representatives." *Sage*, 845 F.2d at 895. The purpose of the regulations are to ensure a full

and fair review. *Id.* at 893-94. A "full and fair review" means "'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'" *Id.* (quoting *Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., Local 813*, 715 F.2d 853, 858 n.5 (3rd Cir. 1983)). Procedural errors will only require reversal if they foreclosed claimant from being heard on the merits. *See id.* at 895 ("The trustee's procedural error concerning the claims review procedure is one of law, but because it did not foreclose appellants from being heard, the district court decision on the partial termination issue will not be set aside.").

Based on the record, the procedural violations that occurred in this case do not, by themselves, require reversal or remand. UNUM notified Plaintiff in its initial denial letter of the evidence on which UNUM relied in making its decision, the plan provisions on which the denial was based, and told Plaintiff the procedures she needed to take for UNUM to review her claim. Although UNUM did not describe the information necessary to perfect her claim, Plaintiff could have inferred what information was necessary based on the specific reasons UNUM gave for denying the claim. *See Lacy v. Fulbright & Jaworski*, 405 F.3d 254, 257 n.6 (5th Cir. 2005) (quoting *Kinkead v. SW Bell Corp. Sickness & Accident Disability Benefit Plan*, 111 F.3d 67, 69 (8th Cir. 1997)) (holding that initial claim denial "need not be extensive" so long as "it explains the basis of the adverse initial decision sufficiently to permit the claimant to prepare an informed request for further review."). For similar reasons, even though UNUM did not provide Plaintiff with the documents she requested, the denial letter told Plaintiff the reasons for the denial sufficient to allow her to effectively appeal the decision. Moreover, Plaintiff did then take the necessary steps to have UNUM review her claim on

31

appeal, including submitting additional information, which UNUM considered.  The Court finds that the procedures followed by UNUM did not prevent Plaintiff's claim from being heard.  UNUM's procedural errors therefore do not in themselves require reversal.  *Cf. Sage*, 845 F.2d at 895 (where procedural defects occurred but applicant not foreclosed from being heard and substantive issue correctly decided, "no purpose would be served by a further, but procedurally correct, review of appellants' claims").

In the alternative, Plaintiff contends that the procedural violations compel the Court to apply a *de novo* standard of review, based on *Gilbertson*.  *Gilbertson*, however, applied a *de novo* standard of review only in the limited situation in which a plan administrator rendered an untimely decision resulting in the claim being "deemed denied."  *See Gilbertson*, 328 F.3d at 631.  By failing to render a timely decision, the administrator's decision in *Gilbertson* was "deemed denied" by operation of law rather than denied through the exercise of discretion, thus, the plan administrator had not rendered a reasoned decision to which the court could defer.  *See id.* at 631-34.  By contrast, in this case, UNUM made two timely decisions in which it exercised its discretion to evaluate Plaintiff's claim. Plaintiff's claim was not "deemed denied" by operation of law.  The *Gilbertson* holding and the application of *de novo* review therefore do not apply in this case.

Rather, the Court finds that the arbitrary and capricious standard of review applies here and that the procedural violations in this case compel an additional reduction in deference within that standard.  The Tenth Circuit in *Fought* held that, when a plan administrator has committed "a serious procedural irregularity," an "additional reduction in deference is appropriate."  *Fought*, 379 F.3d at 1006.  The Court will therefore apply the arbitrary and capricious standard of review using a less deferential standard in which UNUM bears the burden of proving the reasonableness of its

interpretation of the plan terms and that the application of those terms to the claimant is supported by substantial evidence. *See id.* at 1006.  The Court notes that UNUM was also operating under an inherent conflict of interest, because it acted as both insurer and administrator of the plan, further supporting the application of the less deferential arbitrary and capricious standard of review.  *See id. See also DeGrado v. Jefferson Pilot Financial Ins. Co.*, 451 F.3d 1161, 1167-68 (10th Cir. 2006) (decreasing level of deference under arbitrary and capricious review where insurer acted under inherent conflict of interest since it was both insurer and plan administrator).

##### B.    Review of Plaintiff's Claim for Short-Term Disability Benefits

Plaintiff argues that UNUM did not have a substantial, reasonable basis for denying her claim for benefits.  Plaintiff relies heavily on Dr. Pepping's July 2002 evaluation and the conclusions of her treating physician, Dr. Bowen, in his APS.  UNUM, on the other hand, contends that its decision finds substantial support in the record because the medical information did not support an impairment that would prevent Plaintiff from performing the material duties of her job.  UNUM asserts that Dr. Bowen's physical evaluation showed no substantial physical restrictions or limitations; Plaintiff's MRI results indicated no change in her condition from October 2000, when she was able to work, and November 2001, when she claimed she could no longer work; and Dr. Kreuch's November 2001 evaluation revealed only a mild cognitive deficit.  Based on its review of the record, the Court concludes that UNUM's initial denial of benefits on February 27, 2002, was reasonable and supported by the record, but that UNUM arbitrarily and capriciously disregarded the evidence of disability contained in Dr. Pepping's report.

To be "totally disabled" under the plan, Plaintiff must have been "unable to perform each of the material duties of [her] regular occupation."   UASP 010.  Plaintiff's job as an account clerk

required computing, classifying, recording, and verifying numerical data for use in maintaining accounting records.  UACL 00041.  In this case, it is undisputed that Plaintiff was diagnosed with possible MS.  What is disputed is whether Plaintiff's symptoms rendered her unable to perform each of the material duties of her regular occupation.

As of February 27, 2002, UNUM did not act unreasonably in concluding that the objective evidence in the file indicated that Plaintiff was able to perform her job.  Although Dr. Bowen classified Plaintiff's physical impairment as "Class 5 -- Severe limitation of functional capacity; incapable of minimum sedentary activity," and Dr. Bowen stated that Plaintiff could "never" return to work, UNUM did not act unreasonably in rejecting Dr. Bowen's conclusory statements regarding the possibility of Plaintiff working.  UNUM reasonably relied on several objective pieces of evidence in the record that demonstrated that Plaintiff's physical restrictions and limitations were not as serious as Dr. Bowen concluded.  First, UNUM reviewed the results of Dr. Bowen's physical examination of Plaintiff.  Plaintiff's results were as follows:  mild leg weakness; normal upper extremity strength; normal sensory exam with exception of left lateral thigh which "has slight decrease in light touch and pinprick;" normal gait, heel-toe, and tandem walk; and brisk reflexes.  Although Plaintiff complained of weakness in her arms and legs, the physical examination revealed only mild leg weakness. Moreover, despite Plaintiff's subjective complaint of a slight tremor in her right hand, she exhibited accurate finger-to-nose, fast finger movements, and rapid alternating movements.  Dr. Kile, who reviewed Plaintiff's claim on behalf of UNUM, felt that the results of Dr. Bowen's physical examination showed that Plaintiff was not precluded from doing sedentary to light work activity. Second, Plaintiff's MRI did not change from October 2000, when Plaintiff was able to work, to November 2001, when Plaintiff claimed she could no longer work.  The MRIs indicate that there was

no increase in the severity of Plaintiff's disease to support the conclusion that she could no longer work at all, even in minimum sedentary activities.  Third, despite Dr. Bowen's conclusion, he did not prescribe steroids or other MS treatments to Plaintiff in July 2001.  The record indicates that Plaintiff did not have any MS therapy until at least November 2001.  Fourth, Plaintiff did not have a follow up visit with Dr. Bowen after her October 2001 visit until June 2002, approximately eight months later.  The lack of treatment and follow-up visits again suggest a lack of severity in the physical limitations of Plaintiff's disease.  Fifth, UNUM was entitled to rely on the suspicious timing of Plaintiff's claim, which coincided with her moving to New Mexico.  *See Leahy v. Raytheon Co.*, 315 F.3d 11, 19 (1st Cir. 2002) (noting highly suspicious timing of plaintiff's claim as one factor on which insurer was entitled to rely in reviewing claim).  The suspicious timing casts doubt on the extent of Plaintiff's physical limitations.  Finally, Plaintiff herself told Dr. Kreuch that she maintained a "good activity level in general," suggesting her ability to do more than minimum sedentary activity.  All this evidence supports Dr. Kile's conclusion that Plaintiff's physical limitations were not severe.  Although Dr. Bowen came to the opposite conclusion, the record does not show a correlation between Plaintiff's physical symptoms and the conclusion that she was unable to ever work.  UNUM's reliance on Dr. Kile's conclusion therefore was not arbitrary and capricious, as it was supported by substantial evidence.[8]

As of February 27, 2002, UNUM also acted reasonably in determining that Plaintiff was not limited cognitively so that she could not perform each of the material duties of her job.  Dr. Kreuch's

---

[8]Contrary to Plaintiff's suggestion, there is nothing in the record to suggest that Dr. Kile, a medical doctor, was not trained and experienced in the field of medicine such that she was not qualified to assess the extent of Plaintiff's physical limitations based on the record.  The record reflects that a board-certified neuropsychologist, a board-certified psychiatrist, and a board-certified internist all reviewed Plaintiff's file.  UACL 00007.

November 2001 evaluation showed that Plaintiff was average intellectually.  Plaintiff performed in the upper portion of the average range in verbal comprehension, perceptual organization, and working memory.  Dr. Kreuch's evaluation demonstrated that Plaintiff was only mildly limited in her understanding and remembering detailed instructions, ability to attend and concentrate, and ability to adapt to changes in the workplace.  Mildly limited was defined as not significantly limiting the person from consistently and usefully performing the activity.  Although Plaintiff's processing speed index was lower than her other scores, her score was still in the average range.  The November 2001 evaluation, the only mental evaluation provided by Plaintiff to UNUM before its initial decision, does not show that Plaintiff would be unable to work due to mental limitations.  UNUM therefore was reasonable in denying Plaintiff's claim for benefits as of February 27, 2002.

The Court nevertheless takes issue with UNUM's handling of Plaintiff's appeal of her claim. In July 2002, Plaintiff submitted Dr. Pepping's report to support her disability claim.  Dr. Pepping conducted a number of tests on Plaintiff on two separate days.  Following the tests, Dr. Pepping reported that Plaintiff had "significant complex verbal memory retrieval deficits, subtle planning and organizing difficulties, some reduced awareness of mistakes, problems with trial and error feedback, some reduction in verbal inference, some subtle reductions in visual motor speed of information processing, and very significant fatigue for a person of her age."   UACL 00088-89.  The report concluded that the combination of subtle changes in cognition, behavioral regulation, fatigue, and speed of thinking made it unlikely that Plaintiff could withstand full-time competitive work.

UNUM had its own clinical neuropsychologist, Dr. Higgins, review Dr. Pepping's report.  Dr. Higgins, however, stated that he could not do a full analysis of her report without the complete underlying data from Dr. Pepping's evaluation, which was not in the administrative record.  Although

Dr. Higgins expressed doubts about Dr. Pepping's conclusion, opining that it "may be somewhat over[ly] restrictive," he specifically stated that he could not render a definite opinion of Plaintiff's neuropsychological abilities "without evaluation of the underlying data."   UACL 00072. Significantly, UNUM never requested the underlying information.

Instead, UNUM concluded that the July 2002 analysis did not relate back to Plaintiff's condition in the summer and fall of 2001, because Dr. Kreuch's assessment in November 2001 showed that Plaintiff exhibited neurocognitive occupational capacity at that time.  The problem with this conclusion is that Dr. Higgins described Dr. Kreuch's evaluation as "a brief psychological evaluation," which consisted only of a clinical interview, "mini" mental status examination, and Wechsler Adult Intelligence Scale-III test.  UACL 00074, 00118.  In contrast, Dr. Pepping conducted an interview as well as 18 different tests on two different days.  *See* UACL 00089-91.  It was the combination of deficits exhibited from the multitude of tests that led Dr. Pepping to her conclusion that it was unlikely Plaintiff could withstand full time, competitive work.  Dr. Bowen expressly referred Plaintiff to Dr. Pepping "for more complete neuropsychological testing so that tests can be performed in areas that are more likely to be affected with her disease."  UACL 00097.  Dr. Pepping's evaluation gave a more complete picture of the neuropsychological problems Plaintiff faced.  The underlying data from the more extensive and varied tests should have been more thoroughly reviewed in order to determine whether Dr. Kreuch's finding of occupational capacity based on his "brief" evaluation truly captured the extent of Plaintiff's cognitive limitations at that time.  Moreover, Dr. Pepping's "snapshot" of Plaintiff's functioning occurred on two different dates – June 13 and July 11, 2002 – reflecting a larger "snapshot" of Plaintiff's functioning than Dr. Kreuch's "brief" evaluation.

UNUM based its rejection of Dr. Pepping's opinion, not on its merits, but rather on the eight-month delay between her evaluation and Dr. Kreuch's evaluation. Had Dr. Pepping's evaluation been conducted simultaneously with Dr. Kreuch's evaluation, UNUM would not, based on the record, have a reasonable basis for rejecting Dr. Pepping's conclusion. Similarly, if Plaintiff's condition remained unchanged between November 2001 and July 2002, UNUM again would have no basis for dismissing Dr. Pepping's report out of hand based on its lack of timeliness. The question thus becomes whether there is evidence in the record to suggest that Plaintiff's condition deteriorated significantly from November 2001 to July 2002, such that the July 2002 evaluation can be reasonably interpreted as being unrepresentative of Plaintiff's condition on her date of purported disability.

The only evidence in the administrative record suggesting a deterioration in Plaintiff's neuropsychological condition is the fact that Dr. Kreuch's evaluation indicated occupational capacity and Dr. Pepping's evaluation did not. As discussed above, however, Dr. Pepping's evaluation was much more extensive than Dr. Kreuch's, and thus, the difference in opinion could be the result of Dr. Kreuch's brief and limited assessment, rather than a deterioration of Plaintiff's condition over time. UNUM did not substantively consider the difference between the two evaluations, so the record does not indicate one way or the other whether Dr. Kreuch's assessment was sufficient to reveal the same cognitive problems of Dr. Pepping's evaluation. Had UNUM done so, the Court would be in a better position to determine whether the difference in opinion of Dr. Kreuch and Dr. Pepping was due to better testing or a deterioration in Plaintiff's condition.

Furthermore, UNUM had options available to it to determine more objectively whether Plaintiff's condition had deteriorated between Dr. Kreuch's and Dr. Pepping's evaluations. UNUM could have requested that Plaintiff undergo another MRI. Had the MRI shown progression of the

38

disease, then it would have been reasonable for UNUM to conclude that Dr. Pepping's report was not an accurate assessment of Plaintiff's condition at the time of her claimed disability date. UNUM placed considerable importance in the lack of change in the MRIs from October 2000 to November 2001 to support its decision to deny benefits initially. It should have placed no less importance on an additional MRI to determine whether Dr. Pepping's evaluation provided an accurate snapshot or not of Plaintiff's cognitive status in the summer and fall of 2001. UNUM's rejection of Dr. Pepping's report out of hand for untimeliness without additional follow-up analysis to determine whether the report was an accurate assessment of Plaintiff's status at the time of her claimed disability date was unreasonable and arbitrary and capricious.

Moreover, UNUM's outright rejection of Dr. Pepping's report is arbitrary and capricious given the evidence in the record that Plaintiff's supervisor told her that she was not carrying out her duties as expected. UACL 00091. This information was relayed to UNUM in Dr. Pepping's report. Given Dr. Pepping's conclusions, UNUM should have at least contacted Plaintiff's supervisor to determine the extent of Plaintiff's inability to carry out her duties and to evaluate whether her condition in July 2002 reflected the same symptoms as in July 2001.

UNUM's rejection of Dr. Pepping's report based on its untimeliness is particularly troublesome given UNUM's own responsibility for some of the delay. Although Plaintiff certainly was responsible for a good portion of the delay, UNUM contributed to the delay in extending the 90-day period for an initial decision. Evidence in the record shows that UNUM lost Plaintiff's file, which precipitated the need to extend the time in which UNUM processed her claim. *See* UACL 00035. UNUM's procedural violations also may have contributed to the delays in Plaintiff getting the appropriate tests by not providing Plaintiff with copies of relevant materials (those relied upon by

UNUM) and by not telling Plaintiff how to perfect her claim.  Had UNUM more strictly adhered to the minimum ERISA procedural requirements, Plaintiff may have been able to have her neuropsychological evaluation conducted earlier.

Having concluded that UNUM's decision was arbitrary and capricious, the Court must still decide the proper remedy.  Two remedies are generally available where a court finds the plan administrator acted arbitrarily and capriciously:  (1) remand the case to the administrator for a renewed evaluation of the case, or (2) award a retroactive reinstatement of benefits.  *DeGrado*, 451 F.3d at 1175.  Remand is generally appropriate where the plan administrator failed to make adequate findings or to explain adequately the grounds of its decision.  *Id.*  Reinstatement of benefits is the proper remedy where there is no evidence in the record to support UNUM's decision or where the evidence so clearly points the other way as to make a remand unnecessary.  *Id.* at 1176.

As discussed above, Dr. Bowen's physical examination, the MRIs, the lack of treatment, and Dr. Kreuch's evaluation all support UNUM's initial decision denying benefits.  Dr. Higgins' evaluation also casts some doubt about the substance of Dr. Pepping's conclusion, although he stated that he could render a definite opinion without the underlying data.  The Court therefore cannot say that there is no evidence in the record to support UNUM's decision or that the evidence clearly points in favor of Plaintiff.  Thus, the retroactive reinstatement of benefits is not the proper remedy in this case.  Nevertheless, UNUM acted arbitrarily and capriciously in failing to make adequate findings regarding Dr. Pepping's report.  The Court thus concludes that Plaintiff's case should be remanded to the administrator for renewed evaluation of Plaintiff's claim, particularly of Dr. Pepping's report, for further findings or evaluation.  *See id.* (remanding for further findings where administrator failed to make adequate factual findings regarding insured's work status).  In doing so, UNUM is directed

to take new evidence should Plaintiff wish to submit the same.  *See id.*[9]

### C.    Review of Plaintiff's Claim for Long-Term Disability Benefits

Plaintiff alleges in her complaint that she is also entitled to long-term disability benefits.

Compl. ¶ 14.  The administrative record in this case, however, pertains only to UNUM's denial of

short-term disability benefits.  Although the long-term disability policy is part of the Court file,

because it was attached as an exhibit to NANA's motion to dismiss (Doc. No. 9), it is not officially

part of the administrative record that was lodged in this case.  The record is severely lacking as to any

claim by Plaintiff for long-term disability benefits.  For instance, the record is not even clear as to the

date when Plaintiff was hired, a date UNUM claims is significant in determining whether Plaintiff is

entitled to long-term disability benefits.  Although UNUM provides a number of arguments for why

Plaintiff is not entitled to long-term disability benefits, none of those reasons are reflected in the

record or in any of the letters denying benefits to Plaintiff.  *See*, *e.g.*, UACL 00007 (final denial letter

pertains only to Plaintiff's "Short Term Disability claim").   UNUM never reached the issue of

Plaintiff's entitlement to long-term benefits, likely because UNUM denied Plaintiff's claim for short-

term disability benefits.  There is therefore no decision for this Court to review.  Moreover, it is not

clear from the record whether Plaintiff even applied for long-term disability benefits.  Plaintiff's

application for benefits is missing from the record.  Because the Court is remanding Plaintiff's claim

for short-term disability benefits, the Court finds that it is also appropriate to remand Plaintiff's claim

for long-term disability benefits in order for the parties to develop the record in the first instance.  *See*

*DeGrado*, 451 F.3d at 1176 (remand appropriate where administrator failed to make adequate factual

---

[9]The Court recognizes that new evidence of Plaintiff's condition in July 2001 through July 2002 may be limited.  Nevertheless, certain evidence of Plaintiff's condition at the time, such as a report by her supervisor of Plaintiff's ability to work in July 2001, may be available.

findings).

**IT IS THEREFORE ORDERED** that

1.      Plaintiff's motion to overturn UNUM's administrative decision denying benefits is

**GRANTED** (Doc. No. 28) but Plaintiff's request for entry of judgment in her favor is **DENIED**;

2.      UNUM's administrative decision denying benefits is **REVERSED**; and

3.      This case is **REMANDED** to UNUM for further findings consistent with this opinion.

**SO ORDERED** this 20th day of December, 2006, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

42